Leila G. BROWN, et al., Plaintiffs,

**United States of America, Plaintiff-Intervenor,**

v.

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, ALABAMA, et al., Defendants.**

Civ. A. No. 75–298–P.

United States District Court, S. D. Alabama, S. D.

April 15, 1982.

James U. Blacksher, Blacksher, Menefee & Stein, Mobile, Ala., for plaintiffs.

J. Gerald Hebert, Ellen M. Weber, Attys., Voting Section, Civ. Rights Section, U. S. Dept. of Justice, Washington, D. C., for plaintiff-intervenor United States of America.

James C. Wood, Simon & Wood, Mobile, Ala., for Mobile County.

Robert C. Campbell, III, Daniel A. Pike, Frank G. Taylor, Sintz, Pike, Campbell & Duke, Mobile, Ala., for Board of School Comrs.

## OPINION AND ORDER

PITTMAN, Senior District Judge.

This cause was retried by this court upon remand from the United States Supreme Court and the Court of Appeals for the Fifth Circuit.

The plaintiffs are representatives of a class composed of all black citizens of Mobile County, Alabama.[1] They claim that the present statutory system of at-large elections of the five commissioners of the Board of School Commissioners of Mobile County dilutes the voting strength of black citizens in violation of rights guaranteed them by the first, thirteenth, fourteenth and fifteenth amendments to the United States Constitution. The plaintiffs seek declaratory and injunctive relief pursuant to the Voting Rights Act of 1965 and the Amendments of 1970, 42 U.S.C. §§ 1973 and 1973a, and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1343(3) & (4), and 42 U.S.C. § 1973j(f).[2]

The United States of America was allowed to intervene as a party plaintiff by this court's order of December 24, 1980. The United States was not a party to the action when it was originally tried in September of 1976. Jurisdiction is predicated upon 28 U.S.C. § 1345 and 42 U.S.C. § 1973j(f).

The defendants are the Board of School Commissioners of Mobile County and each of the commissioners of the school board,[3] along with the election supervisors and election canvassing board for Mobile County: Probate Judge John L. Moore, Circuit Court Clerk Maurice W. Castle, Jr., and Sheriff Thomas J. Purvis.

The plaintiffs' first cause of action alleges that the at-large election system for school board commissioners violates Sections 2 and 3 of the Voting Rights Act of 1965, as amended. The second cause of action alleges that the electoral system vio-

---

[1] Leila G. Brown, Mary Louise Griffen Cooley, Joannie Allen Dumas, Elmer Joe Daily Edwards, Rosie Lee Harris, Hazel C. Hill, Jeff Kimble, Francis J. Knight, John W. Leggett, and Janice M. McAuthor. The court dismissed the claim of Hazel C. Hill without prejudice on January 14, 1976.

The complaint requests class treatment under *Fed.R.Civ.P.* 23(a) and 23(b)(2).

[2] A claim originally asserted under 42 U.S.C. § 1985(3) was dismissed for failure to state a claim upon which relief can be granted.

[3] When the suit was filed there were five commissioners elected at-large and each was sued in their individual and official capacities. At this time there are six. Four were elected at-large under the statutory method. Two commissioners, Cox and Gilliard, were elected from single-member districts pursuant to the court's order of December 9, 1976, which was ultimately vacated and remanded.

lates the fifteenth amendment to the Constitution, and the third cause of action rests on the fourteenth amendment. The fourth cause of action is based on the State of Alabama's failure to remedy "the continuing effects of its prior official policies and practices of excluding blacks from the electoral process."[4]

The plaintiffs brought suit in this court on June 9, 1975, and this court entered judgment for them on December 9, 1976. *Brown v. Moore*, 428 F.Supp. 1123 (S.D.Ala. 1976). The Fifth Circuit summarily affirmed. On April 22, 1980, the Supreme Court vacated the judgment of the court of appeals and remanded the case "to that court for further proceedings in light of the decision . . . in *City of Mobile v. Bolden*, [446 U.S.] 55 [100 S.Ct. 1490], 64 L.Ed.2d 47 . . . ." *Williams v. Brown*, 446 U.S. 236, 100 S.Ct. 1519, 64 L.Ed.2d 181 (1980).

On remand, hearings were held in this court to resolve the question of whether impending elections should be held under a district or an at-large system. This court entered an injunctive order requiring district elections pending a final trial on remand.[5] The defendants appealed the court's order and unsuccessfully sought a stay in this court, in the court of appeals, and in the Supreme Court. *See Moore v. Brown*, 448 U.S. 1335, 101 S.Ct. 16, 65 L.Ed.2d 1158 (1980). On October 30, 1980, four days before the November general election, for the next single-member district commissioner according to this court's order, the court of appeals ordered that Board President Alexander would continue in office as the non-voting president until a final judgment on remand. The court of appeals

further ordered in its unpublished opinion, No. 80–7610, that this court enjoin the certification of the election results of the November general election for the single-member district commissioner. The court stated it wanted the school board to continue operation as it was prior to this court's order of July 25, 1980.

On remand, this court denied a motion summarily to dismiss the complaint and gave the parties the opportunity to present such additional evidence as was relevant to the issues to be resolved on remand. *See Jones v. City of Lubbock*, 640 F.2d 777, 777–78 (5th Cir. Unit A 1981) (Goldberg, J., specially concurring).

Evidentiary hearings were conducted from April 13 to April 22, 1981. At the conclusion of the hearings, the court permitted the parties, including the United States, to submit post-hearing proposed findings of fact and conclusions of law. The decision rendered herein is based on the evidence adduced at the original trial, the subsequent hearings concerning this court's order, and the remand hearings.

The Supreme Court's decision is found in six separate opinions which must be pieced together to determine the Court's directions on remand. This court and the court of appeals found primary guidance in their initial consideration of this case in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), affirmed sub nom., *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). These cases established the areas of inquiry for a district court presented with a voter dilu-

---

**4.** The defendants object that the State of Alabama is not a named party-defendant nor has the Alabama Attorney General been given notice that the state's at-large scheme is under attack. They apparently contend that the court should not consider the fourth cause of action because Ala.Code § 6–6–227 (1975) requires notice to the Alabama Attorney General when a state statute is alleged to be unconstitutional. They cite no authority for the proposition that this provision should apply to an action in the federal courts under the United States Constitution, or federal statutes. It appears to be a

procedural statute for the courts of Alabama, and inapplicable here, and the court so holds.

**5.** The order, among other things, provided that the single-member district commissioners, Cox and Gilliard, elected in 1978 pursuant to the court's order of December 9, 1976, would continue to hold office, that the next single-member district commissioner election, scheduled for November, 1980, would go forward, and that Board President Alexander would serve out his term, which was to end November 4, 1980, as a non-voting member.

tion case. Both of those cases predated *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), a case involving an equal protection challenge to employment standards in which the Supreme Court held that proof of discriminatory intent was essential to success on an equal protection claim.

The judgment of the Supreme Court in the companion case *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (reserving and remanding and sending this case back with *Bolden*) was announced by Justice Stewart in an opinion joined by the Chief Justice and Justices Powell and Rehnquist. Those justices concluded first that in view of this court's finding that the plaintiff class registered and voted without hindrance, there was not a fifteenth amendment violation.

The defendants concede in their brief that a majority of the justices agreed that a voter dilution claim was cognizable under either the fourteenth or fifteenth amendment.

The plurality next concluded that Section 2 of the Voting Rights Act (as it stood prior to the 1975 amendments) simply paralleled the fifteenth amendment and that the substantive elements are the same as those in a direct fifteenth amendment case. The 1975 amendments adding fourteenth amendment protections in section 2 were not addressed.

The plurality addressed at some length the elements of the fourteenth amendment dilution claim in light of *Washington v. Davis*, concluding that a finding that the challenged practice was adopted or maintained for a discriminatory purpose (intent) (at least in part, see discussion *infra*) is necessary for a finding of a constitutional violation.

Finally, the plurality concluded that this court and the court of appeals erred in deciding the case on the basis of *Zimmer* standards, since that case "was quite evidently decided upon the misunderstanding that it is not necessary to show a discrimi-

natory purpose in order to prove a violation of the equal protection clause." *City of Mobile v. Bolden*, 446 U.S. at 71, 100 S.Ct. at 1502. The plurality then applied what it viewed as the correct post-*Washington v. Davis* standards to the fact findings of this court and concluded that those factors fall short of a discriminatory purpose in the adoption of the at-large voting system.

Justice White dissented, arguing that *White v. Regester* remains viable as a method to make findings supporting an inference of discriminatory purpose and that the facts found by this court amply supported such an inference. This position was adopted by Justice Brennan and, apparently, Justice Blackmun, who would have affirmed the liability determination but reversed the court's remedy choice.

Justice Marshall dissented in a lengthy opinion which, at a minimum, agreed that discriminatory purpose could be inferred from the facts found.

Justice Stevens concurred in an opinion which supports a minimal evaluation basis analysis of dilution claims.

Five justices agreed, therefore, that this court and the court of appeals applied the wrong legal standard, although no majority agreed on the details of the correct standard.

It appears that six justices agree that discriminatory purpose (intent) is a necessary part of plaintiffs' case. One of the six and the other three justices apparently held such purpose had been shown.[6]

The plurality would require that the proof of intent must be substantially more direct. See the analysis of *Bolden* in, *e.g.*, *Lodge v. Buxton*, 639 F.2d 1358, 1369–75 (5th Cir. 1981); *McMillan v. Escambia County*, 638 F.2d 1239, 1242–43 (5th Cir. 1981). This court has viewed its obligation on remand as proper to take additional evidence and evaluate that evidence and the record and make such additional findings as

---

**6.** Justice Marshall did not think purpose (intent) necessary but by a different standard of proof agreed intent had been shown.

necessary to decide the issue of discriminatory purpose (intent) under the proper standard. *See McMillan v. Escambia County*, 638 F.2d at 1243–44.

## FINDINGS OF FACT

The court readopts its findings regarding the operative facts and the issue of unresponsiveness, *see Lodge*, 639 F.2d at 1375, previously entered after the first trial. None of these findings was questioned or disapproved by the court of appeals or any opinion of the Supreme Court. The findings regarding the ultimate issue of discriminatory intent are not readopted at this point, but this issue is reserved for reconsideration upon the evidence as set out above.

*Adoption of At-Large Elections*

In its original findings, this court examined the question of discriminatory intent in the adoption of the at-large plan for school board elections as though it had originated in a 1919 law, Acts of Alabama 1919 (Local), p. 73. *See Brown v. Moore*, 428 F.Supp. at 1123, 1135, 1137. Evidence introduced at the hearing on remand reveals that the present at-large system was actually adopted in 1876. Consequently, a longer and more detailed view of the legislative history of the election system is necessary.

The system utilized when this suit was initiated consisted of five commissioners who ran on a place-type ballot and who were elected by an at-large vote of the county. There was no requirement that each commissioner reside in a particular part of the county. The commissioners were elected on a staggered basis every two years for a six-year term. Acts of Alabama 1919 (Local), p. 73. The defendants, Probate Judge, Circuit Clerk of Mobile County, and Sheriff, or persons appointed in their stead by the Register in equity, serve as the appointing board for election officials and as the Board of Election supervisors to certify election results. *Brown v. Moore*, 428 F.Supp. at 1127.

Alabama was admitted to the Union in 1819. On January 10, 1826, the Alabama Legislature approved legislation establishing a public school system for Mobile County and creating a Board of School Commissioners. Acts of Alabama 1825–26, pp. 35–36. This was some twenty-eight years before the establishment of the public school system for the remainder of the State of Alabama, which occurred in 1854. At that time, the legislature provided for a school board composed of citizens of the county elected at-large. One-fourth of the commissioners were required to reside outside the City of Mobile.

### History of Mobile County School Board 1826–1876

From 1826 until the Civil War, the Alabama Legislature from time to time altered the size and terms of office for either the at-large election or appointment of school commissioners. In 1836, for example, the Mobile School Board was reduced from twenty-four to thirteen members, elected at-large. In 1840, the size of the board was again reduced, this time to eight members elected at-large. In 1843, the legislature enlarged the board to fifteen members, who were specifically named in the Act, and provided for the appointment of their successors by the school commissioners whose terms had not expired. In 1852, the law was amended to provide for a board of twelve school commissioners, all elected at-large for staggered terms of six years. Four school commissioners were to reside outside the City of Mobile.

At the close of the war, President Andrew Johnson established a provisional government in Alabama with Lewis E. Parsons of Talladega as governor.

> Under instructions from Washington Parsons declared all the laws of Alabama enacted before January 11, 1861, in effect, except those concerning slavery, and tried unsuccessfully to build a new civil government on the remains of the pre-Civil War local and state government.

Malcolm C. McMillan, *Constitutional Development in Alabama, 1798–1901: A Study in Politics, the Negro, and Sectionalism*, 90 (1955).

Delegates were elected to a state constitutional convention. The 1865 Alabama Constitution repealed the ordinance of secession, repudiated the Confederate war debt, and ratified the thirteenth amendment. The suffrage requirements both before and after the convention excluded blacks. The state legislature proceeded to pass a series of laws, commonly denominated the "Black Codes", which created various civil disabilities for blacks and attempted effectively to return them to a state of servitude.

The Union Army administered civil affairs; the civil government was reorganized by keeping public employees on the job until a new government elected by the people could be chosen. Governor Parsons authorized the existing Mobile County School Board to keep operating. In November, 1865, there was a popular election for Mobile County school commissioners under the antebellum, at-large, 1852 law. The incumbent school board members ran unopposed for their positions. Under President Johnson's administration, all whites could vote in Alabama, but blacks could not. Only a few whites were denied the ballot because of their refusal to take an oath of future loyalty to the United States.

From 1866 to 1867, as vacancies appeared on the school board by death or resignation, the board exercised its own authority to fill these vacancies. However, when military authorities took over at the beginning of Congressional Reconstruction, the military commander for this district appointed new members to the Mobile County School Board.

In 1867, the historical period known as "Reconstruction" formally began in Alabama. In March of that year, Congress passed the first of several Reconstruction Acts, bringing the swift demise of President Johnson's policies in the South and particularly in Alabama. The state became part of the Third Military District under the tutelage of General John Pope. Pursuant to the congressional act, all elections were cancelled, incumbent local officials retained their offices and vacancies were filled at the pleasure of the military authorities. In the 1867 constitutional convention referendum election, blacks voted in significant numbers for the first time in Alabama history. There were constitutional conventions convened in all the former Confederate states. The purpose was to repeal the conservative post-Civil War constitutions, provide for universal male suffrage, to ratify the fourteenth amendment and to establish civil rights for black citizens. The 1867 constitutional convention in Alabama was attended by one hundred delegates, ninety-seven of whom were Republicans. Nineteen of these delegates were blacks, including several from Mobile. The 1867 convention drafted a constitution which was passed through a combination of black support, a white Democratic boycott of the ratification election and congressional legislation passed subsequent to the election, but applied retroactively. After the adoption of the constitution, a ratification election was held in which Mobile County blacks voted in large numbers. (Gov. Exh. 19)[7] During this period the term "blacks" also included Creoles, persons who descended from original Spanish or French settlers in the Gulf states and who were, at least in part, also descendants of "Negroes".

The first state legislative elections conducted under the 1867 constitution were held in February, 1868. The white Democratic boycott continued and many white males, because of their refusal to take the loyalty oath, permitted the election of an all-Republican delegation for Mobile County, several of whom were black.

The 1868 Alabama Constitution provided for a new state board of education with full legislative power to enact laws in regard to education. Alabama Const., art. XI, section 5 (1868). The new educational system de-

7. Gov. Exh. 19 is an 1868 listing of Mobile County voters, by race, who voted in the 1868 election to ratify the constitution. According to Gov. Exh. 19, there were about 105 whites in Mobile County who voted in the election, about 60 "Creoles" who voted, and in excess of 4,000 Negroes who voted in the ratification election.

parted from the previous system in providing for a high degree of centralization, broad legislative powers in the state board and the earmarking of state revenue for public education. Noah B. Cloud was elected as the State Superintendent of Public Instruction. George L. Putnam, of Mobile, was elected to the State Board of Education. Putnam was from a northern state, and he came to Mobile after the Civil War to set up a Freedmens' School as a representative of the American Missionary Association (A.M.A.). This school for blacks was called variously the Emerson Institute or the Blue College.

In 1868, the Republican-controlled legislature passed a law providing that the school commissioners of Mobile County be appointed by the State Superintendent of Public Instruction. Acts of Alabama 1868, pp. 148–49, 151. State Superintendent Cloud appointed George L. Putnam as Superintendent of the Mobile County Public Schools in July, 1868.[8]

When Putnam tried to post bond to serve as superintendent, Gustavus Horton, who was a member of the Mobile County School Board and probate judge, refused to accept Putnam's bond. Consequently, Putnam was not able to assume the duties of superintendent. In January, 1869, Cloud came to Mobile and attempted to resolve the controversy with the Mobile County School Board, whose members were adamantly opposed to the intentions of Putnam and the State Board of Education to have the A.M.A. school for blacks, the Blue College, included in the Mobile County public system and its teachers paid by public funds. This was not a question of integrating the schools; not even the Radical Republicans proposed so drastic a change during Reconstruction times. Rather, the white conservative Mobile School Commissioners simply were opposed to the progressive principles employed by the A.M.A. teachers, who taught their black students that they were entitled to equal rights. The A.M.A. schools were still operating with Putnam apparently running them. The white schools were under the control of the Mobile School Commissioners.

The efforts of State Superintendent Cloud to compromise the dispute between the "old board" and County Superintendent Putnam failed, despite several proposals and counter proposals.

On March 10, 1869, the old Board of Commissioners informed State Superintendent Cloud that, in Mr. Cloud's words, it did "*not suit them* to comply with the terms of the compromise...." (Gov. Exh. 24 at 39) (emphasis in original).

State Superintendent Cloud, faced with "broken" promises by the old Board of School Commissioners, *id.*, admonished Acting Mobile County School Superintendent Ryland to take charge of the black schools operating under the auspices of the A.M.A. at Emerson Institute. *Id.* at 41–42. The State Superintendent also informed Acting Superintendent Ryland of the effect of the old board's failure to comply with the compromise: "It will vacate the offices of the School Commissioners—it vacates the office of the County Superintendent." *Id.* at 41.

Negotiations between State Superintendent Cloud and the old board continued during the spring of 1869. *Id.* at 45–47. Again, a compromise was apparently reached under the direction of State Superintendent Cloud. Once again, however, the proposed compromise failed, primarily because the old board refused to undertake the general management of the schools in Emerson Institute and operate free public schools in Mobile County.

Finally, on June 30, 1869, State Superintendent Cloud informed Acting Mobile Superintendent Ryland and members of the old board that he was removing them from office for failure to discharge their duties

---

**8.** Mr. Putnam was not a newcomer to the Mobile school system at the time of his appointment in 1868. In June, 1868, the Mobile school board had nominated him to serve on its school board and had sought approval of his nomination from the federal military authorities overseeing Alabama. *See* Gov. Exh. 23, p. 209 (June 10, 1868), of the contents of which judicial notice is taken, *Fed.R.Evid.* 803(8)(A).

under Alabama law. (Gov. Exh. 23 at 256; Gov. Exh. 24 at 47–48). These suspensions by State Superintendent Cloud were officially approved by the State Board of Education on August 19, 1869. (Gov. Exh. 68).

By September, 1869, Mr. Putnam appointed a twelve-member board of school commissioners for Mobile County. (Gov. Exhs. 24, 122).[9] Three of the twelve members of the Mobile school board (C. Perez, L. S. Berry and V. Henry) appointed by Superintendent Putnam were black. (Gov. Exh. 122) (Sept. 8, 1869); (see also Gov. Exh. 19).

At the time when the Putnam-appointed school board began to function in 1869, the old all-white board continued to assert that it was the only legally valid school board in power. (Gov. Exh. 20). The old and new school boards, both claiming simultaneously to govern the Mobile County school system, stood in sharp racial contrast to one another. As reported in 1869, in the Democratic-controlled *Mobile Daily Register*:

> As to a comparison of the new Putnam . . . board with the old board, it is only to be said that the old board has on it a few Radicals who on the Mobile system have been tried and found faithful, and on the new board are to be found three Negroes. Tried white men are safer than untried Negroes. . . .
>
> The existing or old board is not "mongrelized" at all. . . .

(Gov. Exh. 122) (Sept. 8, 1869).

The old board refused to turn over the books, papers and other property belonging to the Mobile school system to the new board, and in September, 1869, the new board and County Superintendent Putnam filed suit in state court seeking an order compelling the old board to relinquish control over the Mobile County school system. (Gov. Exh. 122) (Sept. 25, 1869); (see also Gov. Exh. 20). On September 23, 1869, the old board unanimously resolved that if the state court decision was adverse to them, the old board would refuse to turn over school property to the new board and would

inform the state court of its position. (Gov. Exh. 23) (Sept. 23, 1869).

About October 1, 1869, the state court judge rendered a decision in favor of the new Putnam-appointed board. (Gov. Exh. 122) (Oct. 1, 1869); (see Gov. Exh. 20). The old board refused to vacate their offices and all twelve members were ordered to the county jail on October 2, 1869. (Gov. Exh. 20) (Oct. 2, 1869). While in jail, the members of the old board conducted one school board meeting wherein they voted not to charge tuition for pupils in the intermediate and primary grades. *Id.*

On October 3, 1869, the Alabama Supreme Court granted a writ of certiorari "in the case of the Old Board of School Commissioners, and order[ed] the release of the prisoners." (Gov. Exh. 122) (Oct. 3, 1869). The next day, the public schools opened once again under the auspices of the old board. *Id.* In 1870, the Alabama Supreme Court affirmed the lower state court ruling in favor of the new school board. *Mobile School Comm'rs v. Putnam*, 44 Ala. 506 (1870).

While the appeal of the state court ruling was pending in the Alabama Supreme Court in 1870, negotiations between the old and new school boards continued. (Gov. Exh. 123) (Apr. 19, 1870); (see Gov. Exh. 23) (Apr. 1, 4, 14 & 27, 1870). These negotiations were initiated by Peter Hamilton, an attorney who served as the old board's legal counsel and who represented the old board in the state court litigation. (Gov. Exh. 123) (Apr. 19, 1870). By April 14, 1870, the old board, which by that time had suffered several legal defeats in state court on financial issues contested with Mr. Putnam, agreed to a compromise proposed by Mr. Putnam. (Gov. Exh. 23) (Apr. 14, 1870). One member of the old board, Willis G. Clark, described the thinking of the old board in these terms:

> Under these circumstances, and being unwilling to deprive the community of the

9. Gov.Exhs. 120–129 are clippings from the *Mobile Daily Register* newspaper from 1867 to 1876.

schools which they were unable, from lack of funds, to carry on, the Mobile school commissioners gave directions to surrender the public school buildings in the city to the appointees of the board of education.

(Gov. Exh. 22 at 234). Schools in Mobile County remained under the direction of County Superintendent Putnam from 1870 until the spring of 1871. *Id.*

There is no precise date on which the period known as "Reconstruction" officially ended in Alabama or in Mobile County. One participant in the Alabama state government at that time, Frederick Bromberg, who had been elected to a four-year state senate seat in 1868, offered this explanation of when the period of Reconstruction ended:

In this state that period [Reconstruction] terminated in the fall of 1870, as I shall show, when the Democratic party again resumed control of the state, having elected their governor, lieutenant-governor and all other state officers and an overwhelming majority of the lower branch of the legislature ... [T]he only large towns in the "black belt" were Mobile, Selma, Montgomery and Eufaula. In each of these were active, aspiring Negroes, and also a class of northern men, generally designated as "carpet-baggers," who had been left in the south by the invading armies of the Union, whose chief purpose was to secure the officers required to be filled under the reconstruction measures, and who generally allied themselves with the Negroes, as an ignorant, pliable class of voter, in opposition to the better element of the Republican party.

(Gov. Exh. 89 at 1).

Beginning in the fall of 1870, Alabama began a period of "Redemption"—a period of several years in which state and local officials sought to regain and restore "white supremacy" in the governmental affairs of the state and in Mobile.

The Democratic and Conservative Party in Alabama mounted a major effort in the 1870 elections to defeat the Radical (Republican) Party, and to eliminate blacks, or whites identified with black interests from holding public office in Alabama and in Mobile. The November, 1870, election for State Superintendent of Public Instruction, for example, pitted Dr. Cloud, a Radical Party candidate, against Joseph Hodgson, a Democratic and Conservative Party candidate. (Plaintiffs' expert historians' Trial Testimonies). The voice of the Democratic and Conservative Party in Mobile, the *Mobile Daily Register* newspaper, pleaded with white males to register and vote to rescue Alabama "from the gang of beastly Negroes, thieving carpet-baggers and scalawag adventurers!". (Gov. Exh. 123) (Oct. 4, 1870).

Elections to posts on the State Board of Education were also held in November, 1870, with Democratic and Conservative Party candidates running against Radical Party candidates for those positions as well. (Gov. Exh. 130) (*Montgomery Daily Advertiser,* Oct. 4, 1870).

The November, 1870, election results showed significant political gains in Alabama for the Democratic and Conservative Party. Democrat Robert Lindsay defeated incumbent Republican W. H. Smith for Governor, and Colonel Joseph Hodgson, a Democrat, defeated Republican Dr. Noah Cloud for State Superintendent of Public Instruction. Republicans controlled one house of the legislature and Democrats the other.[10] As of December 4, 1870, the State Board of Education was comprised of eight Republicans (one of whom was black) and four (white) Democrats. (Gov. Exh. 130) (Dec. 4, 1870). The state board met daily in November and December, 1870, with State Superintendent Joseph Hodgson presiding. *Id.*

10. According to the *Montgomery Advertiser* there were 62 Democrats and 35 Republicans serving in the Alabama Legislature as of November 15, 1870. (Gov.Exh. 130) (Nov. 15, 1870). The newspaper also reports that all five members of the Mobile County house delegation were Democrats as of November 15, 1870. *Id.* By comparison, at least one member of the Mobile County house delegation in 1869–70 was black. (Gov.Exh. 84).

On December 14, 1870, the State Board of Education passed a law which restored the election of Mobile County school commissioners. Public School Laws, art. XIV (Nov. Term 1870). The 1870 statute does not appear in the Acts of Alabama because it was enacted by the State Board of Education rather than by the legislature. This statute provided:

§ 2. Board of commissioners.—A board of school commissioners shall take the place of, and act as a board of directors for Mobile County, which board shall be composed of one county superintendent and twelve commissioners, three of which commissioners shall reside not less than seven miles from the courthouse of the present county, and of whom any seven shall constitute a quorum for the transaction of business.

§ 3. Manner of elections.—The said superintendent and commissioners shall be elected on the first Saturday of March, 1871, and upon their first meeting the said commissioners shall classify so that four of their numbers shall hold office for two years from the day of election, four of their number for four years, and four of their number for six years, one of each class to be a member from outside the city; their successors to be elected to serve for six years from the day of their election; *Provided, That in the first election for commissioners only nine commissioners shall be voted for on any one ballot, and in succeeding elections only three shall be voted for upon any one ballot.*

(Emphasis added.)

The 1870 law governing elections for the Mobile County school board provided "that there shall be twelve commissioners, but that only nine shall be voted for on any one ticket—the purpose . . . being to secure to the minority a representation in affairs wherein they are interested." *Mobile Register*, (Gov. Exh. 124) (Mar. 10, 1871). The term "minority" as used in this context refers to black voters or black voter interests. The political explanation for this compromise probably can be found in the fact that by 1870 a Democratic governor

had been elected, but the two houses of the legislature were split between Republican and Democratic control, and the State Board of Education was still controlled by a Republican majority, although the state superintendent was a Democrat. The old Mobile County School Commissioners agreed to accept this compromise.

Elections for the Mobile County School Board were held in March, 1871. The Democrats ran a slate of nine candidates; the Republicans ran a slate of nine. The Democrats, again using the editorial pages of the *Mobile Daily Register*, called on white voters to unite behind the Democratic slate of candidates to defeat "the Professor of Carpet-baggery," Mr. G. L. Putnam. (Gov. Exh. 124) (Mar. 4, 1871).

The Democrats openly appealed to the racial prejudices of the white Mobile County electorate in the March, 1871 school board election, claiming that Putnam's "strength is chiefly confined to the less intelligent voters of the city and county". *Id.* (Mar. 4, 1871). The Democratic Party also contended that only "Radical colored people" supported Putnam, and implied that black voters would likely cast their ballots for Putnam since "these men [black voters] make it a point to go for anybody for an office that the people at large do not want." *Id.* The *Mobile Daily Register* also warned the white electorate that a vote in favor of Putnam was a vote in favor of desegregated schools:

If you want mixed schools—that is, your children and the Negro children in the same rooms, on the same benches, at the same desks, elect the cadaverous carpet-bagger Putnam.

(Gov. Exh. 124) (Mar. 4, 1871).

The slate of nine Democratic party candidates was elected to the Mobile County school board in 1871, and Democratic party candidate Dickson edged Putnam for the Mobile County school superintendency. (Gov. Exh. 124) (Mar. 10, 1871). As a result of the election provision that limited the number of votes that could be cast on any one ticket to nine, "the three highest candi-

dates on the Radical ticket [were] elected, Messrs. Couch, Lomery and Thompson." *Id.* Drury Thompson appears to have been black or Creole. The newly elected school board accepted the Freedmens' schools as part of the public school system in Mobile, pursuant to the political compromise. However, it appears that the elected school board had less authority, met less often and conducted less business during the period between 1871 and 1876, if their minutes are an accurate reflection. Probably the board turned over most of the operation of the schools to the superintendent.

After the March, 1871 election, the *Mobile Daily Register* chided the white electorate for exhibiting voter apathy in the school board election: "Will the white people of this county ever learn not to *forget* that there is a dangerous and inflammable element of black suffrage here that is ever on the alert for mischief, that they cannot safely ignore, and that needs always to be vigilantly watched." *Id.* (Mar. 7, 1871).

The twelve-member school board elected in March, 1871 served for six years as the governing body in Mobile County. No elections for any county public school offices were held in Alabama between March, 1871 and 1876, inasmuch as the State Board of Education in 1873 repealed the law which had provided for county school board elections every two years beginning in 1871. (Gov. Exh. 71 at 23).

The 1875 Constitution, adopted in the spirit of state-wide "Redemption", re-established the local autonomy of the Mobile County school system and required "that separate schools for each race shall always be maintained by said school authorities." Ala.Const. (1875), art. XIII, section 11. The new constitution repealed the provision of the 1868 constitution that had given the State Board of Education legislative authority in educational matters.

The Redeemer Alabama Legislature met in 1876. Virtually everything done in this legislative session had a racial connotation; the fundamental program of the conservative Redeemers was to do away with the restraints Reconstruction had placed on white supremacy. As part of this program, a law was passed doing away with the Mobile County School Board election system that afforded minority access, replacing it with the at-large election scheme, which remains in effect to this date. Acts of Alabama (1875–76), No. 242, p. 363. The Act provided for at-large elections on a county-wide basis, but required that two of the nine must reside within at least six miles of the county courthouse. It further provided for staggered six-year terms with three commissioners to be elected every two years. The restriction against full-ticket balloting was eliminated.

The expert historians who testified about these events, an Associate Professor of History at the University of South Alabama, and a Professor of History at the California Institute of Technology, were of the opinion that the change to the present at-large scheme in 1876 was intended to exclude blacks and their white Republican allies from representation on the school board. The court agrees. Given the sequence of events leading up to Act No. 242, no other conclusion is reasonable or possible.

The 1876 election scheme for Mobile County School Commissioners remains in effect to the present day. The law was amended in 1919 by reducing the number of school commissioners from nine to five. Acts of Alabama (1919), No. 229, p. 73. The at-large method of electing board members was left undisturbed.

The defendants raise two factual contentions with regard to the 1870 and 1876 enactments. First, they contend that the 1876 act could not have been passed with a racially discriminatory intent because the 1870 act did not provide for single-member districts. The crucial relation between the 1870 and 1876 acts, however, is that the former explicitly and deliberately provided for a method of minority representation. The limited vote provisions of the 1870 act were intended, and were so described at the time, as a means of ensuring that the minority would be able to elect its own representatives; single-member districts are not the only means of accomplishing this. The

1876 act was enacted by a legislature whose primary goal was the eradication of any and all results of the attempts by Reconstruction governments to provide equal rights to blacks, was passed in reaction to the 1870 statute, and was clearly intended to eliminate minority representation on the school board. Given the relatively limited indicia of legislative intent available in this era, it is difficult to imagine a case of discriminatory intent more precisely or convincingly made out.

The defendants' second contention is that "[t]he 1876 statute is not being challenged in this case." They contend that the statute under attack in this court, setting up the at-large system, was passed by the Alabama Legislature in 1919.

The plaintiffs' case is simply not so nearly confined. The plaintiffs are not limited as a matter of law to attacking the 1919 statute. That statute did not "create" the at-large system of school board elections; rather, this occurred in 1876. There is no evidence that the 1919 statute changed the at-large feature in any way, thus requiring the examination of that statute.[11]

The soundest ground for arguing that the 1876 statute was not passed with racially discriminatory intent is that it "merely" returned Mobile to the antebellum system of elections originally passed in 1826. The fact that Mobile initially had such a system merits comment. It is, however, less directly related to the intent of the Redeemer legislature than the specific sequence of events from 1870 to 1876, in which minority representation was first given by the Reconstructors, and then taken away by the Redeemers. In fact, the evidence is overwhelming that it was racially motivated.

There is no evidence that the 1876 act was passed even with awareness of the antebellum system. *Village of Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, 466 (1977).

*Present Effects of Past Discrimination*

The at-large system was adopted in 1876 because it was clear to the Alabama Legislature that the at-large form would ensure that the minority, blacks, would never be able to elect a representative sympathetic to its interests. As this court has previously found, *Brown v. Moore*, 428 F.Supp. 1123, 1126–32 (S.D.Ala.1976), the effects of this intent remain to this day. After 1876 no black was elected to the school board until after this court's order of December 9, 1976, as amended December 13, 1976, establishing a single-member district system.

The above finding should not be misunderstood as reflecting any opinion or containing any suggestion that at-large systems are *per se* unconstitutional. Where a specific legislative intent in the enactment is demonstrated, however, the fact that no minority representative, or a representative running on a platform sympathetic to the minority's interests, has ever been elected becomes something other than the "natural tendency" of features such as at-large plans and majority vote requirements. *See City of Mobile v. Bolden*, 446 U.S. at 74, 100 S.Ct. at 1503. The court has attempted to show the precise "present" effect of the at-large system itself because the tendency of the Supreme Court appears to be toward a more particularized inquiry.[12]

In *White v. Regester*, the court examined a much broader range of evidence in con-

---

11. This court does not suggest that an examination of this later statute is necessarily inappropriate. Given that the 1876 statute created the at-large feature of the election plan, examination of the 1919 statute might arguably be appropriate for a determination of whether the plan was somehow "purged" of taint, if any change had been made in the relevant features of the plan. For this purpose, the court considers that relevant features include the at-large feature, limited vote, plurality-win, mixed at-large/district or the geographic limits of any

districts. The defendants have not offered proof of this point, however, and the court expressed no opinion on the argument or any conclusions which might follow.

12. *Cf. City of Mobile v. Bolden*, 446 U.S. at 74, 100 S.Ct. at 1503 (plurality): "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether discriminatory intent [present effect?] has been proven in a given case...."

cluding that discriminatory intent had been established. Although the fate of *White v. Regester* as a test for discriminatory intent in the enactment is at best uncertain after *Bolden,* the court's opinion reviews the present effect of the Dallas and Bexar County at-large plans in the context of several other forms of discrimination. *Accord, Lodge v. Buxton,* 639 F.2d 1358 (5th Cir. 1981).

As this court has previously found, *Brown v. Moore,* 428 F.Supp. at 1127–29, bloc voting continues to occur in Mobile County. Analysis of the political campaigns and elections of representative bodies in Mobile County since 1962, when blacks first became a significant political force after Reconstruction times, shows that the candidates and issues favored by black voters or otherwise associated with black community interests have been uniformly defeated by a bloc-voting white electorate. Analysis of the election returns for several national and local offices in 1980, including the unsuccessful candidacy of a black lawyer who sought the office of Circuit Judge of Mobile County in 1980, demonstrates that the pattern of racial vote dilution continues in Mobile County to the present time. This voting along racial lines "enhances the likelihood that those seeking to manipulate the electoral system for discriminatory purposes will succeed." *Lodge,* 639 F.2d at 1378 n. 41.

The present effect of the at-large system, as a function of its original intent in 1876, is to enhance the discriminatory results of other forms of de jure and de facto discrimination in voting practices and procedures. These other forms of discrimination in turn enhance the present effect of the at-large system, to deny equal access to the political system. The court will first consider other forms of discrimination in voting, and will then turn to discrimination in other areas such as housing, education, employment, economics, and health, as each contributes to the present effect of the at-large system.[13]

The first official disfranchisement device in Alabama, the "Sayre Law", was passed by the Alabama Legislature in 1893. The Sayre Law required that: (1) biennial voter registration be conducted in May, over a month before state office elections and five months before the national election; (2) voters were to display their registration certificates at the polls; (3) illiterate voters were to be aided only by assistants appointed by election officials; and (4) the governor directly appoint all voting registrars, and need not guarantee representation of Republicans or Populists on registration or election boards. Black voter turnout statistics after 1892 proved that the Sayre Law accomplished the legislature's goal of disfranchising blacks; black voter turnout dropped by twenty-two percent (22%) from 1892 to 1894 and thereafter remained below fifty percent (50%).

In 1901, the Alabama Legislature passed an act calling for a constitutional convention in order to restrict permanently state suffrage rights. The primary purpose of the 1901 all-white constitutional convention was to disfranchise the black electorate. Convention delegates emphasized the need to keep blacks out of governmental affairs, because blacks, in their view, were inherently inferior. For example, former Governor Oates, a delegate from Montgomery County, stated:

> Those people are an inferior race. We do not believe the [sic] most of them are entitled to a place in the administration of the state affairs along with an equal to the white men.... There is not a Negro in office in the State of Alabama....

(Gov. Exh. 114) (Proceedings of the 1901 Constitutional Convention at 1662–63). An-

---

13. In this court's view this analysis of present effect, assuming a finding of discriminatory intent in enactment, is a more appropriate means of determining blacks' present access to the political system as a function of an at-large system. Discrimination in the South has been a seamless web; those who would discriminate have first looked to the general conditions of society in which their discriminatory acts would operate. Such occurred in this case. The court's analysis of the facts in *White v. Regester,* as regards present effect, is explicitly based upon this premise.

other delegate, admitting his white supremacist goals, advocated black disfranchisement and racial bloc voting by whites:

We cannot afford to leave the ballot in the hands of enough Negroes to form a respectable faction, for if we do, whenever the whites divide, they hold the balance of power and we have failed to accomplish our mission.

(Gov. Exh. 115 at 2785). To "accomplish their mission", the convention delegates also considered, but did not ratify, a provision prohibiting black citizens from holding elective office in Alabama.

In 1901, the Alabama electorate ratified a constitution containing a full host of voter qualifications: a $1.50 annual, cumulative poll tax; a one year employment requirement; lengthy residency requirements; property ownership requirements; a literacy test; a petty crime provision; and, as a final barrier, powerful boards of registrars with broad discretion in registering eligible voters. The constitution also contained a fighting grandfather clause that guaranteed white suffrage, notwithstanding the above qualifications. Black disfranchisement resulted immediately after ratification of the constitution. In 1900, the black voting age population in Alabama was 181,471 and the white voting age population was 232,-294. (Gov. Exh. 5). By 1903, the number of registered black voters in Alabama was only 2,980, whereas the number of white registered voters was 191,492. (Gov. Exh. 82). In Mobile County, 183 blacks and 7,104 whites were registered to vote around 1903. Id. A comparison of black and white voter turnout in national presidential elections both prior to and following the 1901 ratification election reveals a similar decline in black political participation. The estimated black voter turnout decreased by 96% between the 1900 and 1904 presidential elections, while the estimated white voter turnout decreased by only 19%.

*Boswell Amendment*

During the first half of the twentieth century and until at least 1946, the Alabama Democratic party, an official arm of the state, instituted a "white supremacy" system which excluded blacks from the process of nominating a candidate for all state elective offices, including those for the Mobile County Board of School Commissioners. Nomination by the Democratic Party was tantamount to election. In defiance of the United States Supreme Court's 1944 decision invalidating Texas' "white-primary" statute, *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), Mobile County officials refused blacks the right to participate in the April, 1944 primary election. Gessner McCorvey, the Chairman of the Alabama Democratic Executive Committee and resident of Mobile, declared:

We are going to hold a white Democratic primary in Mobile on Tuesday, as the Supreme Court of Alabama has several times held that fixing of qualification of voters in Democratic primaries is solely and exclusively up to the executive committee of our party.

(Gov. Exh. 116) (*Mobile Press Register* Apr. 30, 1944). To circumvent *Smith v. Allwright*, Alabama amended its constitution in 1946 to provide that only those persons who could read and write, and demonstrate an ability to "understand and explain" any article of the United States Constitution were eligible to register to vote. Democratic Party Chairman McCorvey noted that this amendment, known as the Boswell Amendment, "give[s] certain discretion to boards of registrars and enable[s] them to prevent from registering 'those elements in our community which have not yet fitted themselves for self-government.'" (Gov. Exh. 115) (*Mobile Press Register* Dec. 29, 1945).

The federal courts invalidated the Boswell Amendment, upon challenge by blacks from Mobile County in *Davis v. Schnell*, 81 F.Supp. 872 (S.D.Ala.) (three-judge court), *aff'd per curiam* 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949). A three-judge panel of this court held that the amendment's "main object was to restrict voting on the basis of race or color", in violation of the fifteenth amendment. *Id.* at 880. The court noted that the State Democratic Ex-

ecutive Committee, an official arm of the state, led the fight to enact the Boswell Amendment in order to "make the Democratic party in Alabama the 'White Man's Party.'" *Id.* at 879. The court also found that the electorate understood the legislative purpose of the amendment was to make it "impossible for a Negro to qualify", and that they were urged to "Vote White— Vote Right", by voting for the amendment in the constitutional referendum. *Id.* at 880.

The above facts and the constitutional provisions are only the more prominent of the attempts in Alabama to deny equal access to the political process for blacks.

There has been a long and tortuous history of official racial discrimination against black citizens in the State of Alabama. As late as the 1960's, for example, many lawsuits were filed by the United States to end racially discriminatory voting practices— particularly suits charging that local boards of voting registrars were implementing literacy test requirements in a racially discriminatory manner. *See e.g., United States v. Alabama,* 192 F.Supp. 677 (M.D. Ala.1961) (Alabama voting provisions discussed; Macon County), *aff'd,* 304 F.2d 583 (5th Cir. 1962), *aff'd per curiam,* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962), *see also United States v. Mayton,* 335 F.2d 153 (5th Cir. 1964) (Perry County); *United States v. Atkins,* 323 F.2d 733 (5th Cir. 1963) (Dallas County); *United States v. Elsberry,* No. 3791–65 (S.D.Ala.) (Marengo County); *United States v. Tutwiler,* No. 3200–63 (S.D.Ala.) (Hale County); *United States v. Logue,* No. 3081–63 (S.D.Ala.) (Wilcox County); *United States v. Ford,* No. 2829 (S.D.Ala.) (Choctaw County). Many of these issues raised in these cases were rendered moot by the passage of the Voting Rights Act, which suspended the use of literacy tests in Alabama.

The decades of pervasive voting discrimination in Alabama had the intended effect; there was a marked disparity in voter registration statistics between white and black voting age populations around the time of the 1965 Voting Rights Act. As of November 1, 1964, there were 92,737 blacks registered to vote in Alabama, or 19.3% of the 1960 black voting age population. In contrast, 935,695 whites were registered to vote, or 69.2% of the white voting age population. (Gov. Exh. 117). Enforcement of racially discriminatory policies and practices by state and local officials has had the effect of perpetuating past constitutional violations in Alabama and in Mobile County. (Plaintiffs' expert historians' Trial Testimonies; *see Brown v. Moore,* 428 F.Supp. at 1127). Past racially discriminatory policies have the continuing effects of: (a) denying or abridging the right to vote of black citizens by discouraging them from participating in the electoral processes as voters or candidates, and (b) maintaining "white supremacy" in the electoral process. The present conditions which flow from past violations in Alabama and in Mobile County include at least the following:

*Low black voter registration and participation.* The past history of racial discrimination adversely affects the ability of blacks to participate in the political process of Mobile County because of: the residual effects of previous intimidation; inferior employment opportunities available to blacks; impaired communication between the races; the unfamiliarity of blacks with Mobile County's political machinery due to past exclusion from the political process, and the large size of the county, which disadvantages blacks as a consequence of their low socio-economic status. These broader aspects of discrimination enhance the intended discriminatory effect of the at-large system.

*Barriers to black candidacies.* While black candidates must obtain white votes to win elections, they are, because of past discrimination, denied the opportunities for personal contacts with white voters that are an essential part of the politics in Mobile County. Housing patterns born of Jim Crow laws and whites' opinions of blacks' inferiority combine to deny to black candidates the personal contact through "neighborhood networks" which would exist in multi-racial neighborhoods.

Black candidates have also been the victims of racial tactics employed by the white power structure in Mobile. For example, "[i]n 1969, a black got in a run-off against a white in an at-large legislature race. There was an agreement between various white prospective candidates not to run or place an opponent against the white in the run-off so as not to splinter the white vote. The white won and the black lost." *Id.* at 1128. Black candidates, as well as persons experienced in local politics, have already testified in this case that it would be futile for a black to attempt to run at-large. The absence of black elected officials, in turn, discourages black voters from participating in the electoral process, as they perceive it to be a futile exercise.

*Racial bloc voting.* The inequities between blacks as a group and whites as a group are significant in the electoral process, where whites vote as a bloc against any black candidate or any white candidate identified with black voters or their interests. *See id.* Ninety percent (90%) of the

residents in the greater Mobile area, including the City of Mobile, were born in Alabama. (Gov. Exh. 117) (1970 Census). To the extent that past official racially discriminatory policies of the state have had an effect on the attitudes of whites as well as blacks, virtually all of the voting age population in the county would be affected. Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls.[14]

*Maintenance of At-Large Elections*

One long-term indicator of an intent to maintain at-large school board elections for discriminatory purposes is the difference in expenditures for white and black pupils from 1876 until 1955, the year after the Supreme Court's decision in *Brown v. Board of Education*, overruling the "separate but equal" doctrine of *Plessy v. Ferguson.* Plaintiffs' expert analyzed the biennial reports of the Alabama State Superintendent of Public Instruction for the years 1870 to

---

14. Evidence offered established that de jure racial discrimination has profoundly affected the attitudes of white voters toward blacks. Perpetual bonded slavery became a universal feature of the southern economy after the 1600's, although there were some free blacks in the South and in Mobile they were few in number and occupied a distinctly inferior status. Slavery became increasingly necessary to the southern economy after short staple cotton became profitable; this coincided with an increasingly active abolitionist movement in the North. Just before the Civil War, southerners began to develop an extensive rationale for the belief that slavery was a positive good for blacks as well as whites.

Several men, most prominent of whom was Dr. Josiah Nott of Mobile, argued that men had derived from different origins. They maintained that blacks had permanent deficiencies rendering them inferior to white. They, and others using their premises, argued that since blacks needed guidance, slavery was a benevolent way that superior whites and inferior blacks could live together. The black labored for the white who in turn provided the necessary guidance for the blacks. The enormous volume of literature on this subject, reinforced by speeches from pulpit, courthouse, and newspaper office, created a deep belief in most southerners that, not only was slavery good but that blacks were too inferior to assume the duties and responsibilities of citizenship.

After the decade of the 1850's, during which the United States Supreme Court in *Dred Scott v. Sanford*, 30 U.S. 393, 15 L.Ed. 691 (1857), agreed with the South that slavery was protected by the Constitution, the Civil War was waged from 1861 to 1865. Slavery was symbolically ended by Lincoln's 1863 Proclamation of Emancipation, but in fact only by the advancing federal troops. Southerners made a magnificent stand against superior military forces, suffered great losses of manpower and property, and lost. The South, having given all it had in the destructive Civil War, had little to show for it but "The Lost Cause". In the course of the next two decades, the "lost cause" would be elevated to one of the most enduring myths of history, one that enabled the South to keep the blacks in their place, out of public office and out of the voting booth; after having lost the Civil War, Mobile's participation in the Redemption-era celebration of the lost cause is perhaps most vividly illustrated by the actions of the Mobile County School Board during the period immediately after Reconstruction.

The historical events discussed above contributed directly to the election law "reforms" and the Jim Crow laws, enacted around the turn of this century. The effects of this history and the laws which it spawned, continue today.

1963. The expenditures show a steadily decreasing per capital expenditure for black students as compared to white students.[15]

Between 1870 and 1876, per-pupil expenditures for black students based upon school age population ranged from 0.825 to 0.870 that for whites, or fairly substantial equality. Based upon actual enrollment, black students received 1.139 times that spent on whites. The first year after 1876 for which figures are available is 1882; based upon population, the ratio is 0.55. From 1882 to 1890, the figure drops slightly to 0.50. In 1891, the law controlling distribution of funds was changed. Before then, Alabama law required the state school board to distribute funds on a school age population basis. Local funds and poll tax distributions were discretionary. In 1891, these provisions were abrogated, and funds were distributed at the discretion of local school boards. Thereafter, there is a general declining trend in the ratio of expenditures for black and white pupils, which decreases to 0.277 in 1940.

With the Supreme Court's decision in *Brown v. Board of Education* in 1954, the per-pupil ratio leaps to 0.958, where it remained until figures were no longer published in 1963. School boards in the South were acutely aware of the *Brown v. Board of Education* decision, as well as other litigation filed by, for example, the N.A.A.C.P.[16]

The above figures, especially the decrease in the ratio after 1876, suggest strongly that the intent to deny blacks representation on the school board, and by extension of education itself, was in fact the motivation behind the 1876 statute. They also supply the necessary ingredient of unresponsiveness in a maintenance claim. *Lodge*, 639 F.2d at 1375.

The accuracy of the historian's analysis of the intent behind the reduction of expenditures for black pupils is confirmed by his comparison of Mobile trends to trends in North Carolina. Blacks in North Carolina were disfranchised around 1900; until that time they enjoyed relatively free voting privileges. Before that time, per-pupil school expenditures for blacks remained relatively equal and did not decrease as was the case in Mobile. After about 1900, a difference in North Carolina rates begins to appear. From this plaintiffs' historian concludes that when the election system and voting practices afforded blacks the opportunity to protect their interests in the school system—or when federal pressure did so after 1954—blacks received more even-handed treatment in the delivery of school services. The court agrees and so finds.

As to the remaining elements of the test enunciated in *Lodge*, the court readopts its original findings.

More recent events further substantiate the finding that the at-large election system is being and has been maintained for a racially discriminatory purpose. This court previously found, *Brown v. Moore*, 428 F.Supp. at 1130, that as recently as 1970, another judge of this court was forced to threaten members of the Board of School Commissioners of Mobile County with $1,000 per day contempt fines for their refusal to comply with orders to desegregate the public schools. As of the time of retrial, no order had been entered in the Mobile County school desegregation case, *Davis v. Board of School Commissioners*, No. 3003–63–H, declaring that Mobile County finally has a unitary school system.

---

**15.** Precise measurements of this kind, when considered in the light of history by a qualified expert, go far to remove the objection that "gauzy sociological considerations" might underlie a plaintiff's case. *City of Mobile v. Bolden*, 446 U.S. at 75 n.22, 100 S.Ct. at 1504 n.22. Hard data interpreted with an eye toward consistency, as had been offered here, speaks more forthrightly than statements by politicians, which may be subject to complex and various

interpretations. The consequences of at-large elections for the delivery of school services to blacks are patently clear in this data; it would be difficult, and the defendants have not attempted, to refute the conclusions to be drawn on this point.

**16.** Figures for 1955 to 1963 are based upon salaries rather than building expenditures.

There is, further, the matter of the 1975 and 1976 bills proposed in the Alabama Legislature.

*The Kennedy and Sonnier Bills: 1975–76*

In 1975, shortly following the commencement of this lawsuit, black State Representative Cain Kennedy introduced a bill into the Alabama Legislature proposing a single-member district election system for the school board. House Bill 1243 (Reg. Sess. 1975). Mr. Kennedy advertised his bill as a local bill prior to introduction. The school board offered to support the bill (hereinafter "Kennedy Bill") if the dates of the plan's phase-in provisions were amended; it sent its former legal counsel, George Stone, to Montgomery to draft the necessary amendments. The Alabama Legislature passed the modified bill on October 10, 1975, as Act 1150. The Mobile school board then obtained a dismissal of the claims against it in this case on the grounds that passage of single-member district legislation mooted the challenge to the at-large election scheme. Order of November 21, 1975.

On February 7, 1976, less than three months after the order of dismissal, the school board instituted a state court action attacking the constitutionality of the Kennedy Bill.[17] The basis of the suit was that the final version of the Kennedy Bill differed materially from the originally advertised bill. Among the fatal variances, however, was one demanded by the board members themselves: alteration of the dates for phasing in the single-member district plan. In their public statements on the suit, the defendant commissioners proclaimed that they would not take a position in state court for or against the constitutionality of the Kennedy Bill, but with the actual or constructive knowledge and acquiescence of the defendants, their counsel aggressively attacked and "most strongly urge[d]" judicial condemnation of the Kennedy Bill in state court. The plaintiffs in the instant federal court case were not served or notified of the pendency of the state court case.

No one defended the constitutionality of the Kennedy Bill. The Circuit Court of Mobile County promptly entered the judgment sought by the school board, holding the Kennedy Bill invalid. Order of February 17, 1976.

On March 1, 1976, the plaintiffs moved to rejoin the school commissioners as defendants, and this court granted the motion on March 8, 1976. The proceedings were delayed for over three months, and as a result no final decision could be rendered by this court prior to the 1976 school board elections. The defendants guaranteed this result by refusing to file an answer in the action until July 12, 1976, after a motion for default judgment had been filed by the plaintiffs.

Following their rejoinder as defendants, the school board proposed a second single-member district bill, which was introduced as a "general law of local application" by State Representative Nat Sonnier of Mobile on July 8, 1976. House Bill 1060 (Reg. Sess. 1976). School board members previously had attempted to persuade black State Representative Gary Cooper to introduce the bill, but he refused to do so. Cooper, suspicious of the school board's motives, testified at trial in 1976:

> I felt that it was a ploy being used by the Mobile County School Board so that they could come back and tell the Judge here in Mobile that we were trying to get a bill passed. Of course, we knew that if the bill passed ... it could be challenged, and it would mean another two or three years before any result could come to this problem.

(Tr. 365).

Immediately following the introduction of the "Sonnier Bill", the school board moved to continue further proceedings in this case while the legislature considered the bill. The defendants also sought to dismiss the suit in September, 1976, claiming that the plaintiffs, acting through several black legislators, were blocking the

---

17. The plaintiffs in *Brown v. Moore* were not named as parties in this state court action, nor were they served with, or notified of, the com-

plaint. The only defendants in the state court proceeding were the local election officials who had been defendants in *Brown v. Moore*.

Sonnier Bill and therefore lacked clean hands. This court denied both the school board's motion to continue and motion to dismiss. Order of September 7, 1976.

At trial, this court found that the defendants, not the plaintiffs, were acting with unclean hands in proposing single-member district legislation as a means of delaying the lawsuit. *Brown v. Moore*, 428 F.Supp. at 1134. During the September, 1976, hearings on defendants' motion to dismiss, the school board's counsel had represented to this court that the Sonnier Bill "would have met all constitutional tests and requirements" and "would meet every constitutional test." (Tr. 8, 10). At trial, however, the board's counsel took the opposite view. In the following colloquy he noted that as a general law of local application, the Sonnier Bill could not have constitutionally applied to Mobile County:

THE COURT: So, if that is true an act passed as a general act . . . would be unconstitutional?

COUNSEL FOR THE BOARD: I think it would.

THE COURT: So, the proposed Act [the Sonnier Bill] this last time was, therefore, unconstitutional?

COUNSEL FOR THE BOARD: *There never was any doubt in my mind about that.*

(Tr. 1420–21) (emphasis added).

This court found that the school board's tactics were similar to the "lack of cooperation and dilatory practices" that the school board had displayed in opposing and obstructing school desegregation. *Brown v. Moore*, 428 F.Supp. at 1134. Later, this court noted that the purpose of "the defendants' different positions on legislative proposals to provide for single-member district[s] . . . [ha]s been to delay and defeat their alleged support of the legislative actions." Order of November 24, 1978, pp. 7–8.

While this action was pending in the appellate courts, the defendants took additional actions to defeat the remedial purposes of this court's redistricting orders and to dilute the voting strength of the two black

school commissioners, who had been elected from single-member districts under the court's plan. This court held in its order dated November 24, 1978, pp. 7–8, that:

These inconsistent positions of the defendants in the federal court system in this case, and the position of certain board members in attempting to frustrate the single-member district plan ordered . . . reflects a *pattern of conduct* of these defendants condemned by this court concerning the defendants' different positions on legislative proposals to provide for single-member district [sic] of the board . . . In short, it is obvious that the basic thrust of these actions by the defendant board, and certain of its members, have [sic] been to delay or defeat their alleged support of the legislative actions and this court's orders of the single-member district plans for the board designed to remove the unconstitutional dilution of the black votes.

The court has considered the testimony offered at retrial on the motives behind the opposition to the Kennedy Bill. It is clear that one motive was that severe consequences would follow from operating elections or the school system under unconstitutional legislation. It is equally clear that this was not the sole motive of the school board in opposing the legislation, however. In the context of the board's actions in the local *Davis* desegregation case, and its "tooth and nail" opposition to any decision on the merits in this case, this court previously found, and reiterates its finding, that the board acted with the specific intent to maintain the at-large system. Given its consistent intransigence in *Davis*, the further conclusion is warranted that its acts were motivated by an intent to maintain the at-large system for the purpose of denying blacks a voice in the operation of the county's school system. The court so finds.

Pursuant to this court's original opinion and order in this case, the remedial measures prescribed by the court included the 1978 election of two board commissioners from two predominantly black areas, Districts 3 and 4. In compliance with this

directive, primary elections were held for the two seats in September of that year. Two black citizens, Mr. Norman G. Cox and Dr. R. W. Gilliard, won their respective primary races for the board and were elected without opposition in the general election of November 7, 1978. Eight days later they were sworn in as members of the board.

On October 11, 1978, more than a month *before* the new black board members took office, the "old", all-white board adopted a new set of internal policies at its regular meeting which supplanted the policies in use since August of 1974. A comparison by the court of the two sets of policies revealed substantive changes enhancing the position of president or chairman and the relative power of the white board members and decreasing the relative power of the new black members.

The powers of the non-voting chairman (president) were expanded to his or her control over board matters in the following ways:

(1) An override of the president's decision on points of order now requires a two-thirds majority of the board (i.e., four votes), whereas a simple majority (i.e., three votes), would suffice under the August, 1974 policies.

(2) Emergency board meetings now may be held only upon the request of the president;

(3) The president is now an ex-officio member of all committees (compare old and new policy § BBC);

(4) The president possesses the power, with the approval of the board, to appoint chairpersons of all advisory committees whereas the recommendation of the superintendent was part of the procedure before;

(5) The president must approve all items to be placed on the written agenda of regular board meetings.

It is significant, too, that the necessary number of votes of board members was raised from three to four creating in the words of Chairman Alexander a "super" majority, with regard to the following actions:

(1) To call special meetings of the board;

(2) To override prior actions of the board;

(3) To constitute a quorum.

Board President Dan C. Alexander, Jr. declared at a press conference and claimed in open court that a number of the policy changes adopted in October were designed to give continuity and stability to prior board policy by circumventing the creation of a new three-person majority on the board consisting of the two new black board members and a present member of the board. Alexander said that this new majority would work to overturn previous actions and prior policy of the "old" board.

The board meeting of October 25, 1978, demonstrated the powers of the president or chairman to prevent a majority of the board members from prevailing on issues of importance. The board had been unsuccessful in its attempts to elect a non-voting chairman and at the October 25 meeting one board member announced his intention to break the deadlock by changing his vote to create the necessary three-person majority for board member Drago. Chairman Alexander employed his authority to pass on points of order in deciding unanimous approval by the board was essential to place the vote for non-voting chairman on the agenda, since it was not part of the written agenda for the meeting. With two votes against supplementing the agenda with this matter, Alexander refused to permit such a vote.

These actions stand in sharp contrast to the procedures employed by Alexander subsequent to this court's finding of him as well as board members Bosarge and Sessions in contempt on October 20, 1978, for failure to vote pursuant to this court's decree in this cause. Alexander, as board chairman, had no difficulty with the procedure to poll the board and to permit himself to change his previous abstention to a vote for Drago. Neither did he have difficulty in allowing Bosarge and Sessions to vote again. Furthermore, the following day he had little trouble in conducting another

vote and permitting Sessions to change his vote from Bosarge to Drago, one of the candidates for the position designated by the court.

It is also to be noted that in proceedings subsequent to the court's order, the defendants vacillated and pressed inconsistent positions in an obvious attempt to frustrate the single-member district plan.

These actions, coupled with those of certain board members, reflect a pattern of conduct intent on maintaining the dilutive effect of the at-large system.

The core and thrust of this court's previous rulings in this litigation have been to remedy the unconstitutional dilution of the black vote in Mobile County in the election of board members and the resulting board policies that flow from this impermissible dilution. It is the finding of this court that the policy changes adopted by the board in October of 1978 were devised to and would have functioned to encumber the attempts of new black board members to place on the agenda and secure sufficient votes, according to voting procedures at the time of this court's original order, for passage of proposals promoted by and in the interest of their constituents. This revisionary action by the board represented a continuation of the unconstitutional voter dilution this court sought to remedy in its earlier decree. Additionally, the court finds the enhanced powers of the non-voting president or chairman were implemented to stave off board members' efforts to obtain adoption of programs and policies to which the president has objections. A more clear intent to purposefully maintain a racially discriminatory system would be difficult to imagine.

The relevancy of the intent of the board is due to be clarified. *City of Mobile v. Bolden,* 446 U.S. at 74 n.20, 100 S.Ct. at 1503 n.20. Legislation in Alabama either applies to the state at large or to local counties or cities. In the latter case, the practice in the past was to use a "local bill",

which required advertisement of the terms of the bill in the area to be affected by the legislation; another practice was to use a "population" or "population bracket" bill, which in theory was a "general bill of local application." This latter practice was later declared unconstitutional by the Alabama Supreme Court. *Peddycoart v. City of Birmingham,* 354 So.2d 808 (Ala.1978).

In the case of local or population bills, the legislators testified that they considered what was good for the state or locality, and did not necessarily follow the desires of local officials affected by the bills. This does not insulate local officials' intent from scrutiny, however. It is clear, and was so in this case, that local officials are consulted as to whether a local bill is desirable; local interests are the only interests to be served, directly at any rate, by local or population bills. A legislator may have no particular "motive" at all, apart from effectuating the will of the local constituency. Local officials, especially when they are officers of the state agency affected by the bill, are so connected to the policy-making process in such cases that their intent is relevant, if not crucial, to the enactment, or failure of a bill. The court concludes that such was the case here.

### JURISDICTION

The United States is a party to this lawsuit. There is no question that the United States may maintain an action pursuant to Section 12(d) of the Voting Rights Act of 1964, 42 U.S.C. § 1973j(d), to enforce the guarantees of Section 2 of the Act. This court has jurisdiction of such an action. 28 U.S.C. § 1345; 42 U.S.C. § 1973j(f).

*Private Right of Action* [18]

### CONCLUSIONS OF LAW

A. *The Statutory Claim—Purpose or Effects Test*

The court will first make an analysis of the scope or coverage of the Voting Rights

---

18. Defendants felt there was no need to address this issue as the United States had been allowed to intervene. This court considers this is not an issue and it has not been addressed.

If the court is mistaken, the parties are requested to file appropriate motions to this court.

Act § 2 claim. Six of the justices in *Bolden* declared that Section 2, premised on the fifteenth amendment, does not support a claim of voter dilution when there was no purpose (intent) to discriminate. It is noted that their holding was based on the pre-1975 language of Section 2 and its single constitutional basis of the fifteenth amendment. The 1975 amendments clearly extended the scope of the Act to protect fourteenth amendment rights as well.

These changes aside, it seems from an analysis of the six separate opinions in *Bolden* that the court would find a *voter dilution claim* arising out of the fifteenth amendment but the standards varied. Six impose a purpose test. Stewart, J., the Chief Justice, Powell, J., and Rehnquist, J. did not think the evidence supported such a finding. 446 U.S. 62, 100 S.Ct. at 1497. Stevens, J. concurred specially but would impose a different standard. *Id.* at 83–94, 100 S.Ct. at 1508–1514. White, J. thought the evidence supported an inference of intent. *Id.* at 103, 100 S.Ct. at 1518. Marshall, J., *id.* at 103–141, 100 S.Ct. at 1518–1540, would find voter dilution on different standards. Brennan, J., *id.* at 94, 100 S.Ct. at 1514, agreed voter dilution had been established. Blackmun, J., *id.* at 85–86, 100 S.Ct. at 1509–1510, apparently agreed voter dilution had been established but objected to the remedy. *Accord Lodge v. Buxton*, 639 F.2d at 1364 n. 11; *United States v. Uvalde Consol. Ind. Sch. Dist.*, 625 F.2d 547 (5th Cir. 1980); *cert. denied*, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858; *McMillan v. Escambia County*, 638 F.2d 1239 (5th Cir. 1981) *cert. denied* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981).

■ This court notes that the legislative history of the Voting Rights Act of 1965 makes no mention of at-large systems. However, in House Report No. 91–397 explaining the 1970 amendment, the committee's statement in favor of extending the temporary provisions of the Act pointed out that:

> The record before the committee indicates that as Negro voter registration has increased under the Voting Rights Act, several jurisdictions have undertaken new, unlawful ways to *diminish the Negro* franchise and to defeat Negro and Negro-supported candidates. The U. S. Commission on Civil Rights has reported that these measures have taken the form of switching to *at-large elections where Negro voting strength is concentrated in particular election districts* and facilitating the consolidation of predominantly Negro and predominantly white counties. H.R.Rep.No.397, 91st Cong., 2d Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 3277, 3283. (emphasis added).

This passage points out that Congress apparently intended for the Act to encompass vote dilution claims arising under the fifteenth amendment. Even so, the addition of the fourteenth amendment as a new constitutional basis in the 1975 amendments certainly requires this court to hold a vote dilution claim cognizable under section 2.[19] The Act was intended as a comprehensive blanket to smother the flames of discrimination in voting. To find that section 2 does not encompass a vote dilution claim would leave a technical loophole the proponents of this legislation thought was covered. This court does not read the Act so narrowly and is of the opinion that the weight of authority and reason favors the conclusion that section 2 does encompass and prohibit vote dilution.

Since this court did not discuss section 2 in its 1975 opinion, it will address now the plaintiffs' argument that the Voting Rights Act of 1975 contains a single substantive standard—the effect test of section 5 and in particular that this standard applies to sec-

---

**19.** The legislative history of the 1975 amendments, commenting on *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), reiterated the view that Congress intended, in extending and amending the Act, to broaden its scope and coverage to all forms of voter discrimination which had existed originally or evolved in defiance of Congress' purposes in passing this legislation. S.Rep.No. 295, 94th Cong., 1st Sess. 27–28 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 774, 793–94.

tion 2 rather than a "purpose" test. This court does not agree.

*Bolden* reveals that the question of which standard to apply under section 2 was not directly addressed.[20] Defendants assert that section 2 requires the purpose test because, *inter alia,* no post-*Bolden* case has held that a showing of effect is sufficient. The parties have not shown and this court has not discovered, any Fifth or Eleventh Circuit precedent which directly confronts the issue. *See United States v. Uvalde Consol. Ind. Sch. Dist.,* 625 F.2d at 554 n.12.

The court now directs its inquiry into whether section 2 post-amendment, buttressed by the fourteenth amendment, requires proof of intent or effect. It is appropriate to again examine the legislative history of the Act.

It is important to understand the framework of the Voting Rights Act of 1965. It does not affect all states in like manner. "Covered" states and political subdivisions are subject to a series of special statutory remedies.[21] Similarly, the Act reveals the congressional belief that some voting changes and procedures (i.e. "tests or devices") are more suspect than others and as such receive disparate treatment under the Act.

The discussions in the legislative history show substantial concerns over what events were so suspect as to require "automatic" review and which were considered of lesser importance unless applied in a discriminatory fashion.

The enactment of "tests or devices" to restrict the franchise was found to be the most common method of discrimination and, therefore, under section 3(b), a judicial determination of purposeful or effective discrimination authorized their suspension.[22]

Sections 4(a) and 5 are examples of the disparate treatment among the jurisdictions. In the "covered" jurisdictions,[23] section 4(a) automatically suspended the use of "tests or devices" and section 5 mandated prior federal approval of any voting changes subsequently enacted. Both of these provisions, like section 3(b), required application of the "purpose or effect" standard of proof before their tests, devices or practices could be retained.

Those practices which Congress deemed patently discriminatory were automatically suspended or abolished nationwide. Covered jurisdictions had all of their restrictive practices, whether patently discriminatory or not, suspended. In order to reinstitute such practices in either situation, the purpose or effect test was applied.

This pattern is contrasted with other sections of the Act, notably section 3(c), dealing with non-covered jurisdictions and those practices not automatically suspended or abolished. Section 3(c) permits the court to exercise its continuing jurisdiction for remedial purposes only upon such determination. Once a violation is proved, the practice cannot be reinstituted until the purpose or effect test is satisfied.

Section 3(c) concerns itself with "voting qualification[s] or prerequisite[s] to voting, or standard[s], practice[s], or procedure[s] with respect to voting" enacted subsequent to a judicial determination of a fourteenth or fifteenth amendment violation. 42 U.S.C. § 1973a(c). This provision was set up to reach those "pockets" of discrimination outside of section 4(a)'s covered jurisdiction. The "pocket trigger" provision does not utilize the automatically-presumed-discriminatory approach pioneered in

---

**20.** The plurality found section 2 to be no more than an elaboration on the fifteenth amendment and therefore the purpose test was required. Due to the court addressing the Act as it was before the 1975 amendments to the Act, this opinion is not dispositive. The other separate opinions do not confront this issue other than tangentially via the fifteenth amendment.

**21.** For those jurisdictions covered by the 1965 legislation, *see* [1970] U.S.Code Cong. & Ad.

News 3277, at 3279, for those subsequently brought under coverage by the 1970 amendments, *see* [1975] U.S.Code Cong. & Ad.News 774, at 779. The 1975 amendments added the State of Texas to the covered jurisdictions.

**22.** The use of poll taxes was so abhorrent that Congress abolished them entirely under § 10.

**23.** See n.21, *supra.*

sections 3(b), 4(a) and 5. Instead, these alleged discriminatory "qualifications, prerequisites, etc." retain the "traditional case-by-case approach." [1965] U.S.Code Cong. & Ad.News 2437, 2475. The significant feature of this provision is that a court must first adjudicate a constitutional violation before the purpose or effect test is applicable to the qualifications, etc.

Section 2, granting the general right to freedom from racially discriminatory voting practices, uses the language of section 3(c), i.e. "qualifications, etc." and it is only reasonable to infer that Congress intended it to apply "across the board" in like manner. It does not apply only to "tests or devices" or "covered" jurisdictions.

In the first instance, the purpose or effect test as used in section 5 is not in reality a substantive standard, but delineates the burden of proof necessary to overcome the "automatic" and "covered" presumptions. Secondly, this argument ignores the structure of the Act and the disparate treatment hierarchy intended by Congress. If Congress had meant to apply the purpose or effect test to section 2 it would have used explicit language as in sections 3(b), 4(a) and 5. If it had intended for "qualifications, etc." to be synonymous with "tests or devices" it would have repeated that phrase or otherwise made it clear it was to be treated similarly.

■ The entire purpose of the Act, when viewed as a whole, was to set up two separate categories of legislation with distinct procedures and standards to handle two types of situations: (1) facially legitimate practices in noncovered areas and (2) patently discriminatory practices and covered areas. To engraft plaintiffs' effect standard onto section 2 would defeat this congressionally-blessed differentiation. That some practices and jurisdictions were initially to be given the "benefit of the doubt" is clearly shown by the legislators who protested the passage of the Act, contending it created "second class states" and exempt[ed] other[ ] [states] which have literacy tests also." [1965] U.S.Code Cong. & Ad.News 2437, 2487, 2537.

Though less significant than statements made contemporaneous with the passage of the Act, it is enlightening to note that there is a current congressional proposal to amend section 2 so that it would require only a showing of discriminatory effect.

In conclusion of this issue, it is apparent that Congress meant to correct those most pervasive and patent categories and jurisdictions of voting discrimination with the less severe purpose or effect test while requiring other categories and jurisdictions whose histories did not reveal such practices to pass constitutional muster, i.e. the purpose test. There is no legislative history or language in the 1975 amendments which indicates Congress intended to include an effect test under section 2.

An analysis of *Bolden* reveals a majority of six as favoring purpose (intent) as a prerequisite to finding a fifteenth amendment violation.

Justice Stewart's opinion, writing for the plurality, expressed that the purpose (intent) test is a polestar by which fifteenth amendment violations are judged and the evidence was insufficient to find a purpose by their standard, 446 U.S. at 62, 100 S.Ct. at 1497. Justice Stevens specially concurring, *id.* at 87, 100 S.Ct. at 1510, applied a different standard. Justice White opted for the purpose (intent) test but felt "an invidious discriminatory purpose can be inferred...", *id.* at 94–95, 100 S.Ct. at 1514. Justices Marshall, *id.* at 136, 137, 138, 100 S.Ct. at 1537, 1538, Brennan, *id.* at 94, 100 S.Ct. at 1514, and Blackmun, *id.* at 80, 100 S.Ct. at 1506, did not endorse the necessity of proof of purpose (intent) but stated "assuming" or "accepting" that intent was necessary, discriminatory purpose had been shown.

■ For the foregoing reason, the court concludes that a showing of discriminatory purpose (intent) *is* required to prevail under section 2 as amended in 1975. Effect alone is insufficient.

### B. Constitutional Claims

The several *Bolden* opinions represent the intersection of earlier vote dilution prece-

dents from *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) to *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), with more recent holdings on intent under the fourteenth amendment. *Personnel Adm. of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Notwithstanding the divisions among the members of the *Bolden* court, several principles emerge from their statements of law, read together with *Feeney, Arlington Heights* and *Washington v. Davis.*

■ First, an intent to discriminate is a necessary element of a violation of the fourteenth and fifteenth amendments.[24] Second, discriminatory intent need not be the sole purpose behind the challenged action. *See Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. at 265–66, 97 S.Ct. at 563. Third, the decision maker must have "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Personnel Adm. of Mass. v. Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296.

Four panels of the Fifth Circuit have considered the meaning of *Bolden*. Three panels agree that intent is required, and that the intent need not be the sole motivation for the challenged act. *Lodge*, 639 F.2d 1358; *McMillan*, 638 F.2d 1239; *United States v. Uvalde Consol. Ind. Sch. Dist.*, 625 F.2d 547.

A panel of the Fifth Circuit has held that Voting Rights Act § 2 applies to school board elections, and that it applies to at-large elections. *United States v. Uvalde Consol. Ind. Sch. Dist.*, 625 F.2d 547. These holdings are binding on this court, as no other panel has held to the contrary.[25]

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

■ A punctilious analysis of *Bolden* leads the court to the belief "that the primary, if not the sole, focus of the inquiry must be on the intent of the political body responsible for making the districting decision." *City of Mobile v. Bolden*, 446 U.S. at 90, 100 S.Ct. at 1512. The requisite intent must be discerned in the evidence by the use of the legal principles set out in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597; *Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; *Personnel Adm. of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870. To satisfy the intent standard of the *Bolden* plurality, discriminatory purpose of some sort must be proved; however, plaintiffs are not required to show that it was the sole purpose. *McMillan*, 628 F.2d at 1243.

■ The court must proceed on to determine the extent to which historical discrimination impacts on a minority group's present opportunity for effective participation in the electoral process. *Lodge*, 639 F.2d at 1377; *cf. Lee v. Lee County Board of Ed.*, 639 F.2d 1243, 1260 (5th Cir. 1981) ("a substantial, direct and current segregative effect" required with regard to an interdistrict transfer program in a school desegregation case). Discrimination in other contexts, such as housing, education, employment, economics, health, voting devices, and others, is only relevant to this inquiry to the extent that it affects the present effect of the at-large system itself. The Supreme Court noted in *White v. Regester* that the district court's findings explained

the history of official racial discrimination . . . which at times touched the right of Negroes to register and vote and to participate in the democratic processes.

---

24. *See* discussion *supra* p. 1102.

25. In *McMillan*, 638 F.2d at 1242–43 & nn. 8 & 9 (5th Cir. 1981), the panel held that a vote dilution claim is subject only to the fifteenth amendment, and therefore does not arise under

section 2. The panel adopted the plurality view, however, which was based upon section 2 as it existed prior to 1975. The unamended statute presently has no application to this action.

412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973). A consideration of the present effects of an at-large system, therefore, does not end with the bare finding that housing patterns are segregated, or educational opportunity has been unequal, or that a lesser percentage of blacks are registered to vote as a result of past voting discrimination by poll tax, literacy tests, or other qualifications or prerequisites. The court will consider to what extent, if any, the at-large system itself contributes to a present denial or equal access to the political process. This will be done with an eye to an "ultimate assessment of the multi-member district, overlaid, as it was, on the cultural and economic realties" of the state or political subdivision in question, or in "an intensely local appraisal of the design and impact of the . . . multimember district in the light of past and present reality, political and otherwise." *White v. Regester*, 412 U.S. at 769–70, 93 S.Ct. at 2341. An examination of "the results and effects of invidious discrimination, and treatment in the fields of education, health, politics and others" is clearly relevant to this question. *Id.* at 768, 93 S.Ct. at 2340. Unless these are tied by evidence to the effect of the at-large system itself, however, they shed no light on whether the at-large system has a present discriminatory effect.[26]

■ Though the present system was established many years ago, the passage of time cannot transform an unconstitutional system into a constitutional one, if it continues adversely to affect the voting rights of the persons who were its intended victims. *See McMillan*, 638 F.2d 1239.

Thus, the remand requires the court to examine the record and new evidence for proof (1) of discriminatory purpose in the adoption of the at-large commission system, and (2) that such discriminatory conduct has present adverse affects on plaintiffs.

■ The evidentiary factors this court will examine in sifting the evidence for an invidious legislative purpose are as follows (derived largely from *Arlington Heights*):

(1) The impact of the election plan—whether it bears more heavily on one race than on another. 429 U.S. at 266, 97 S.Ct. at 563.

(2) The historical background of the legislative decision, "particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267, 97 S.Ct. at 564.

(3) The "specific sequence of events" leading up to the decision. Sudden changes that counteract events favoring the minority group can show invidious intent. *Id.*

(4) "Departures from the normal procedural sequence." *Id.*

(5) "Substantive departures . . . particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached." *Id.*

(6) The legislative history, especially contemporary statements by lawmakers, their minutes and reports. *Id.* at 268, 97 S.Ct. at 565.

(7) The trial testimony of those involved in the decision making process. *Id.* *See McMillan*, 638 F.2d at 1243.

*Feeney* has been interpreted as adding a substantial gloss on the *Washington—Arlington Heights* factors:

Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of", not merely "in spite of", its adverse effects upon an identifiable group.

(citations omitted), *Personnel Adm. of Mass. v. Feeney*, 442 U.S. at 279, 99 S.Ct. at

---

**26.** The plurality in *Bolden* noted that "evidence of discrimination by white officials in Mobile is relevant only as the most tenuous and circumstantial evidence of the constitutional invalidity of the electoral system under which they attained their offices." 446 U.S. at 74, 100 S.Ct.

at 1503. This is clearly the holding of *Feeney* and *Arlington Heights* which were foreshadowed in *Washington v. Davis.* A similar rule should apply to the present effects requirement.

2296. This court reads *Feeney* as simply rejecting, as a complete measure of constitutional intent, the "awareness of consequences" or "foreseeability" argument. Such is still a factor to weigh in the analysis.

### C. *Application of Law to Facts*

 Applying the *Arlington Heights—Feeney* standards, the court must first examine the impact of the Redeemer Alabama legislative act passed in 1876 on black representation on the school board. The adverse racial impact of the at-large elections is crystal clear. Blacks had been serving on the school board under another type plan prior to the 1876 act. None have been elected or have served since that time under an at-large scheme. It was only after the institution of the single-member district plan under this court's previous order, now in limbo on remand, that blacks have been elected to the board. The contemporary statements by white Democratic leaders made explicit invidious purpose of the 1876 at-large scheme. That purpose was to insure the election of all white members to the exclusion of blacks.

The court concludes on the basis of this analysis and on the basis of the plaintiffs' expert historian that the 1876 act creating the at-large elections for the school board was adopted with the invidious purpose of electing only whites and excluding blacks. This court in its 1975 order, now on remand to this court, based its conclusions on a 1919 amendment. On evidence developed on remand the 1919 act was merely a modification of the 1876 act, both being at-large schemes. The 1919 act reduced the number of board members. The finding herein should not be misunderstood as representing any opinion, or containing any suggestion, that at-large systems are per se unconstitutional. Where a specific legislative intent in the enactment is demonstrated the fact that no minority representative or a representative running on a platform sympathetic to the minority's interests has ever been elected becomes something other than

"a natural tendency" of factors such as at-large plans and majority vote requirements. *See City of Mobile v. Bolden*, 446 U.S. at 74, 100 S.Ct. at 1503. This court has attempted to show the precise "present effect" of the at-large system because the tendency of the Supreme Court appears to be toward a particularized inquiry.[27]

It is not entirely clear that the court will demand so close a scrutiny of the present effect of an at-large plan than that found, except where there has been a change in structure of a governmental body. In *White v. Regester*, the court examined a much broader range of evidence in concluding that discriminatory intent had been established. Although the fate of *White v. Regester* as a test for discriminatory intent in the enactment is at best uncertain after *Bolden*, the court's opinion in *White v. Regester* reviews the present effect of the Dallas and Bexar County at-large plans in the context of several other forms of discrimination. *Accord, Lodge*, 639 F.2d 1358.

As this court has previously found, bloc voting continues to occur in Mobile County. Analysis of the political campaigns and elections of representative bodies in Mobile County since 1962, when blacks first became a significant political force since Reconstruction times, shows that the candidates and issues favored by black voters or otherwise associated with black community interests have been uniformly defeated by a bloc-voting white electorate. Analysis of the election returns for several national and local offices in 1980, including the unsuccessful candidacy of a black lawyer who sought the office of Circuit Judge of Mobile County in 1980, demonstrates that the pattern of racial vote dilution continues in Mobile County to the present time. This voting along racial lines "enhances the likelihood that those seeking to manipulate the electoral system for discriminatory purposes" will succeed. *Lodge*, 639 F.2d at 1378 n. 41.

The present effect of the at-large system, as a function of its original intent, is to enhance the discriminatory results of other

---

**27.** *See* n. 12, *supra.*

forms of de jure and de facto discrimination in voting practices and procedures. These other forms of discrimination in turn enhance the present effect of the at-large system, to deny equal access to the political system. The present effects are set out in the court's original findings which have not been overturned. *See Bolden v. City of Mobile*, 423 F.Supp. at 387–94. The court reaffirms these findings including the findings that the system, now found to have been established with discriminatory intent, is unresponsive to the needs of the plaintiffs.[28]

Based upon the above analysis and the findings of fact, the court holds the motivating factor for the at-large election system enacted in 1876 for the Mobile County School Board was the purpose (intent) to discriminate against blacks, and to deny them access to the political process and political office. The court further holds that the present effects of this discriminatory intent continue to the present. The plaintiffs have met the burden of proof and the court holds that the at-large plan violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, 42 U.S.C. § 1983, and the fourteenth and fifteenth amendments to the United States Constitution.

The alternative holding here, which is the holding of *Lodge*, rests upon a finding of discriminatory maintenance without regard to the explicit reconsideration of the at-large plan in 1975 and 1976. The panel held as noted above, that unresponsiveness is now a necessary element of a *Regester/Zimmer/Kirksey* claim. In this connection, the plurality noted that

> [T]he District Court relied in part on its finding that the persons who were elected to the commission discriminated against Negroes in municipal employment and in dispensing public services. If that is the case, those discriminated against may be entitled to relief under the Constitution, albeit of a sort quite different from that sought in the present case . . . [E]vidence of discrimination by white officials in Mobile is relevant only as the most tenuous

and circumstantial evidence of the constitutional invalidity of the electoral system under which they obtained their offices. 446 U.S. at 73–74, 100 S.Ct. at 1503. It must be remembered that the plurality was speaking of an enactment claim, not a maintenance claim. *Id.* at 74 n. 21, 100 S.Ct. at 1504 n.21. The application of this language to a maintenance claim was, on the other hand, the precise holding of *Bolden.*

The plurality does not state that the actions of local officials are wholly irrelevant to the question of whether a plan has been maintained with a discriminatory intent. It would impliedly accept the proposition that, given other evidence of intent, a present failure to accomplish the purposes of the governmental body in equal delivery of services, or representative appointments to decision making positions, could buttress the conclusion that an at-large system was being maintained with that intent. In the absence of such evidence, where services, appointments or other indicia of responsiveness are denied or reduced to black citizens across the board, a court could well conclude that the intent to discriminate goes beyond the simple denial of the subject services, to the denial of a public voice. For this court to demand of plaintiffs that they find express declarations of the purpose to discriminate, in a day when public officials are acutely aware of the ever-present threat of civil rights litigation, is nothing less than a cynical disregard for the fact that local and special governmental bodies do not exist for the sole purpose of representation in the abstract. Rather, they exist in large part to provide functions such as police and fire protection, street construction and repair, and a structure for community life. This is the implicit premise of *Lodge.*

In this case, the special purpose governmental body is a school board. The court has noted above, as well as in the records of *Davis v. Board of School Commissioners*, the consistent denial of equal education to

---

**28.** *See* n. 13 *supra.*

blacks, which was demonstrated by large differences in per-pupil expenditures until federal intervention began in 1954 with *Brown v. Board of Education*, and which continued to the time this case was heard on remand in the defiant refusal to obey constitutional obligations so apparent in *Davis.* The conduct of the school board and its attorney in connection with the Kennedy and Sonnier Bills and the effort of the board to enhance the voting power of the white members against that of the black members elected under this court's single-member district plan in its order of 1975 was done with purpose of racial discrimination. Based on these findings, including those entered at the first trial, this court concludes alternatively that the at-large system has been maintained in violation of 42 U.S.C. §§ 1973 and 1983, and the fourteenth and fifteenth amendments to the United States Constitution.

## ORDER AND DECREE

Pursuant to the above findings of fact and conclusions of law, it is hereby ORDERED and DECLARED that the present at-large system for electing Mobile County School Commissioners, adopted in 1876, No. 242, Ala. Acts 1875–76, p. 363, and amended in 1919, No. 229, Ala. Acts 1919, p. 73, violates the rights of the plaintiffs and the class of black voters of Mobile County guaranteed by Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and by the fourteenth and fifteenth amendments to the United States Constitution.

The defendants, and each of them, their officers, agents, attorneys, employees and those acting in concert with any of them or at their direction, are hereby permanently ENJOINED from conducting further elections of Mobile County School Commissioners under the aforesaid at-large system. The membership of the school board will remain as it is presently operating until further orders of this court.

Pursuant to the rule of *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), the court will withhold entry of a remedial order to provide the State of Alabama the opportunity to enact a constitutional election plan prior to the primary and general elections in 1982. Upon motion of one or more of the parties, or upon the court's own motion, if it appears that no such legislative response will be made in time for the 1982 elections, the court will carry out its responsibilities under *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), to develop and implement a remedial plan.

The plaintiffs are entitled to recover their costs and attorneys' fees, in amounts to be determined by subsequent orders of this court.

This court retains jurisdiction of this action pending further orders to ensure compliance with this decree.